**People of the State of ILLINOIS, Plaintiff,**

v.

**The GRIGOLEIT COMPANY, William Christian, Jr., and Lee Enterprises, Inc., Defendants.**

**The Grigoleit Company, Third Party Plaintiff,**

v.

**Midland Machine Corp., Dennis O. Punches, Patricia A. Punches, and Lee Enterprises, Inc., f/k/a/ Decatur Herald, f/k/a Decatur Herald and Review, Inc., Third Party Defendants.**

**No. 98–CV–2261.**

United States District Court, C.D. Illinois.

July 14, 2000.

---

James L. Morgan, Thomas E. Davis, Office of the Attorney General, Springfield, IL, for plaintiff.

Frederic L. Kenney, Winters, Featherstun, Gaumer, Kenney, Postelwait, Stocks & Flynn, Decatur, IL, for defendant/third party plaintiff Grigoleit Company.

Jon D. Robinson, Kehart, Shafter, Webber & Campbell Robinson, Decatur, IL, for defendant William Christian, third party defendants Midland Machine, Dennis & Patricia Punches.

Charles C. Hughes, Monica Hawkins, Hughes, Hill & Tenney, Decatur, IL, for defendant/third party defendant Lee Enterprises.

### *ORDER*

McCUSKEY, District Judge.

This case is before the court for ruling on: (1) a Motion for Summary Judgment

(# 60) filed by Third Party Defendants, Dennis O. Punches and Patricia A. Punches (the Punches); (2) a Motion for Partial Summary Judgment (# 72) filed by Plaintiff, the State of Illinois (State); (3) a Motion to Strike (# 63) filed by Defendant, the Grigoleit Company (Grigoleit); (4) a Supplemental Motion to Compel (# 76) filed by Grigoleit; and (5) a Motion Pursuant to Rule 37(# 97) filed by Grigoleit and adopted (# 99) by Defendant Lee Enterprises, Inc., a corporation d/b/a Decatur Herald & Review (Herald & Review). Following a careful review of the documents presented and the arguments of the parties, this court rules as follows: (1) the Punches' Motion for Summary Judgment (# 60) is GRANTED; (2) the State's Motion for Partial Summary Judgment (# 72) is GRANTED; (3) Grigoleit's Motion to Strike (# 63) is GRANTED; (4) Grigoleit's Supplemental Motion to Compel (# 76) is DENIED as moot; (5) Grigoleit's Motion Pursuant to Rule 37(# 97) adopted by the Herald & Review (# 99) is taken under advisement. The issue of sanctions against the State and its attorneys will be taken up at trial.

## FACTS

This court's recitation of the facts is based upon the parties' Statements of Uncontested Facts and the documents and deposition transcripts submitted to this court by the parties.

In 1969 or 1970, Ray H. Christian (Ray) purchased approximately five acres of real estate on Brush College Road outside of Decatur, Illinois. Ray and his son, Charles William Christian (William), built a powerhouse, a main shop building and a garage on the property. In approximately 1977, Ray and William began operating a business at the site doing machine repair and selling used fork trucks. The business was incorporated as Midland Machine Corp. The corporation was dissolved in December 1983 for failure to file an annual report and failure to pay an annual franchise tax. Ray and William used waste oil at the Midland Machine property for heat, to run a rock crusher and for a generator

to produce electricity. William testified that they used a "cracking tower" on the site to burn used motor oil to make No. 3 grade fuel oil. William testified that they received waste oil in barrels from various sources. William stated that all of the waste oil was consumed.

William testified that, in 1980, he and Ray picked up approximately 125 barrels from Grigoleit. James E. White, who was maintenance manager at Grigoleit at that time, told them they could have· used hydraulic oil from Grigoleit. White testified that he remembered Ray and William coming to Grigoleit to pick up barrels. White was not sure when this occurred, but thought it was in 1980 or early 1981. White testified that he did not know how many barrels Ray and William obtained from Grigoleit. White testified that he did not help Ray and William but that other employees of Grigoleit helped them load the barrels and told them to take only hydraulic oil. White testified, however, that he was not certain that Ray and William only picked up hydraulic oil. White testified that it was company policy not to mix solvents with hydraulic oil. However, White stated that it was possible they may have mixed solvents and oils. According to William, he and Ray picked up three loads of barrels and took all of the barrels that Grigoleit had at that time. William said that the barrels they received from Grigoleit did not contain hydraulic oil, but instead contained "old, smelly solvents and highly flammable things." William testified that some of the barrels contained many products all mixed together. William stated that he and Ray were not able to use any of the material in the barrels and just stored them on the property in an area by themselves.

William testified that, in 1983 and early 1984, he and Ray received 85 to 90 barrels of used ink with solvent in it from the Herald & Review. He testified that they picked up barrels from the Herald & Review on three occasions. William said there was only a thin layer of solvent on

top and the rest of it was "old, thick, greasy ink." William testified that none of the material in the barrels was ever used. Maurice D. Dixson, who was building superintendent at the Herald & Review at the time, confirmed that Ray and William received ink waste in the early 1980's. William testified that, at the end of Ray's life, he would accept anything that was free. Several witnesses testified that there was junk and debris all over the Midland Machine property.

Ray died of a heart attack on March 11, 1984. Ray did not leave a will and owned four parcels of real estate at the time of his death. William and his sister, Patricia Punches, were Ray's only heirs. They decided how to split up Ray's estate. Ray's residence was sold and the proceeds of $5,000 were split between the two of them. William then began living at the Midland Machine property. William and Patricia agreed that William would receive the Midland Machine property. Patricia received a piece of farmland which was sold for $15,000 and a parcel of property in Decatur which was leased to Deco Manufacturing (Deco property). On December 27, 1985, Patricia and her husband, Dennis, executed a warranty deed to William giving him sole title to the Midland Machine property. The Punches now own the Deco property in joint tenancy. They receive $1,620 per month for the Deco property pursuant to the terms of the lease. The lease with Deco Manufacturing ends in January 2001. The Deco property was last appraised at $120,000.

After Ray's death, William continued to operate a business at the Midland Machine property. However, William testified that he no longer received waste oils in drums after Ray's death. He stated that he buys heating oil which is put in a heating oil tank and also purchases used motor oil which is put in the stove heat tank. All of this oil is totally consumed.

On March 13, 1984, the Illinois Environmental Protection Agency (Illinois EPA) conducted an inspection at the Herald & Review. Dixson told the inspector that, for the last eight or nine months, waste had been picked up by Ray. Following the inspection, the Herald & Review was found to be in apparent violation of regulations which prohibited the delivery of special waste to a hauler who is not a licensed special waste hauler and the delivery of special wastes to a site that does not have a valid operating permit. The inspection report noted that the Herald & Review cleaned ink out of its presses using a solvent, naphtha. On March 30, 1984, Richard Johnson, an Environmental Protection Specialist with the Illinois EPA, contacted William by telephone to inquire whether he was accepting waste from the Herald & Review. On May 9, 1984, Glenn Savage, Jr., also with the Illinois EPA, wrote a letter to William stating that he was in violation of various statutes and regulations because he was not a permitted special waste hauler and had accepted waste from the Herald & Review. The letter further stated that William would be contacted at a later date to set up an inspection of his property.

On December 14, 1988, Steven Townsend, an Environmental Protection Specialist with the Illinois EPA, drove by the Midland Machine property. He saw drums lined up which were visible from the road. Townsend did another drive-by inspection in January 1989. He tried to conduct an on-site inspection on July 25, 1989, but William would not allow him to inspect the property. An administrative search warrant was obtained and an inspection was conducted on August 3, 1989. Townsend, Johnson and other employees of the Illinois EPA participated in the inspection. William told Townsend that some of the drums contained waste solvents from Grigoleit and some contained ink from the Herald & Review. William said that most of the drums contained waste oil which he used for heating the shop during the winter. Townsend and the other inspectors located and numbered 320 drums. Townsend testified that many of the drums were leaking. Samples were taken from 32 of the drums.

Brenda K. Hillen, a chemist who works for the Illinois EPA, tested the samples for volatile compounds. Her reports showed that some of the samples contained such substances as naphthalene, acetone, toluene, ethylbenzene and zylene. Reeve W. Norton, who was employed by the Illinois EPA at the time, tested samples for flash points. Norton testified that a flash point of less than 150 degrees was indicative of hazardous wastes. He stated that two samples had a flash point less than 70 degrees Fahrenheit. The record contains a 1983 Illinois EPA inspection report based on an inspection of Grigoleit. The report noted that Grigoleit makes decorative panels for appliances and generates waste solvents including toluene, xylene, acetone, naphtha, methyl alcohol and butyl cellosolve.

Because some of the drums were found to contain hazardous substances, on August 13, 1990, the Illinois EPA issued a Seal Order sealing the site. Conditions at the site continued to deteriorate and, by 1993, one-half to two-thirds of the drums were found to be unsound. In January 1993, the Illinois EPA hired a contractor, Riedel Environmental Services, to overpack the drums at the Midland Machine property. Riedel worked approximately one week at the site. Riedel did not overpack empty drums or drums which were in sound condition. Riedel overpacked drums which contained substances and had deteriorated. All of the drums which contained substances, whether overpacked or not, were placed in a staging area on a plastic tarp. Jennifer Seul, a licensed professional geologist who works for the Illinois EPA, was the project manager for the Midland Machine property from January 1993 to 1997 or 1998. Seul testified that, at the time the overpacking work was done, no removal site evaluation or remedial site evaluation had been performed. There was no publication regarding the site or any of the work done on the site, and the Illinois EPA did not allow for any public comment period. Seul took four soil samples in 1993. Seul testified that the testing of the soil samples showed that "there was a chemical impact to the soil presumably from the drums."

On May 24, 1993, the Illinois EPA issued a "Notice Pursuant to Section 4(q) of the Illinois Environmental Protection Act" to William, Grigoleit, the Herald & Review and others. The "4(q) Notice" contained a finding that "[t]he release of hazardous substances from the Site ... presents an immediate and significant risk of harm to human life and health and the environment." The Notice gave the parties 21 days to prepare a detailed work plan for the Illinois EPA's review and approval.

On September 21, 1993, Grigoleit submitted a proposed voluntary work plan for removing drums from the site. Seul testified that it would normally take one to two months to review such a proposal. However, she testified that she did not completely review the proposal before it was withdrawn by Grigoleit on October 1, 1994. Seul testified that the Herald & Review submitted a voluntary work plan in February 1994. After some revisions, this plan was eventually accepted on July 3, 1995. On August 8, 1995, the contractor hired by the Herald & Review, Environmental Associated Services & Engineering, Inc. (EASE), conducted sampling at the site. In November 1996, EASE removed 83 drums attributable to the Herald & Review from the site. Seul was at the site periodically to oversee the work. The 83 drums were disposed of as special wastes rather than as hazardous wastes. According to Sue Doubet, an employee of the Illinois EPA, special waste contains hazardous substances, just not at a sufficient concentration to be considered a hazardous waste.

In 1994 or 1995, William sold a strip of land along Brush College Road to the County for a road widening project. The County paid him $4,000 to $5,000 for the strip of land and later built a four-lane highway. William testified that he moved four rows of overpacked barrels away from the area the County needed for the road.

Doubet testified that she was assigned to be project manager for the Midland Machine property in December 1998 or January 1999. She inspected the site on April 27, 1999. Doubet testified that approximately 130 drums remain at the site. Doubet testified that she saw spills from the drums running off the edges of the plastic. She stated that what needs to be done is to overpack any drums which need to be overpacked, stage all the drums, sample all the drums, determine the proper disposal characteristics of the substances in the drums, find someone to accept the drums and get them off the site. After that, any stained soil would need to be cleaned up and an additional foot of soil would need to be excavated. Soil samples would then be taken to determine if even more soil should be removed. Doubet estimated that the entire project would take approximately two weeks.

On May 20, 1999, Grigoleit again submitted a voluntary plan to remove the 130 drums remaining at the property. Under the terms of the proposed plan, the work would be performed by Bodine Environmental Services, Inc., an Illinois EPA approved contractor. The Illinois EPA has not approved this plan. Doubet testified that she requested help from the United States EPA to cleanup the site. She testified that, as of September 1999, the Illinois EPA had not completed a site assessment and confirmed that no public comment had been requested regarding the site.

On November 3, 1998, the State filed its Complaint (# 1) against Grigoleit and William. The action was brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.) and the Illinois Environmental Protection Act (Illinois Act) (415 Ill.Comp.Stat. 5/1 et seq. (West 1996)). The State sought to recover costs it incurred for response, remedial and investigative activities undertaken as a result of the release or threatened release of hazardous substances at the Midland Machine Facility (Facility). In its First Claim for Relief, the State alleged that Defendants Grigoleit and William are jointly and severally liable to the State for all past and future response costs. In its Second Claim for Relief, the State alleged that Defendants are jointly and severally liable to the State for all past and future response costs and for punitive damages. In its Third Claim for Relief, the State sought a declaratory judgment holding Defendants liable for all future costs incurred by the State in connection with the Facility.

On January 6, 1999, Grigoleit filed its Answer to the Complaint, Affirmative Defenses, Counterclaims against the State and Cross-claims against William (# 3). Also, on January 15, 1999, Grigoleit filed a Third Party Complaint against the Herald & Review (# 6) and a Third Party Complaint against Midland Machine Corp. and the Punches (# 7). William filed an Answer to the State's Complaint (# 8) and an Answer to Grigoleit's Cross-claims (# 25). The Third Party Defendants have filed Answers to Grigoleit's Third Party Complaints (# 19, # 26).

This court subsequently entered an Order which dismissed two of Grigoleit's counterclaims against the State. In addition, the State was later allowed to file an Amended Complaint (# 95) naming the Herald & Review as an additional Defendant as to the State's First Claim for Relief. The Herald & Review filed an Answer to the Amended Complaint (# 96).

On December 27, 1999, the Punches filed a Motion for Summary Judgment (# 60). On March 15, 2000, the State filed a Motion for Partial Summary Judgment (# 72). The State is seeking a judgment against Grigoleit and the Herald & Review on the issue of liability under CERCLA and the Illinois Act.

## ANALYSIS

### I. INTRODUCTORY REMARKS

This court initially notes that it found the record before it in this case very disturbing. The record shows that the Illinois EPA was aware that there were

drums at the Facility in March 1984. However, based upon the record currently before this court, 130 drums, many of them leaking off the protective plastic and onto the soil, remain on the site as of today's date, more than 16 years later. The inaction of the Illinois EPA in this case is extremely baffling to this court, especially considering Doubet's testimony that a cleanup of the Facility would take about two weeks of work. This court additionally notes that the Herald & Review did remove its drums from the site in November 1996. Grigoleit has proposed several voluntary plans for removing the remaining drums. Under the terms of Grigoleit's latest proposed voluntary plan, the work would be done by Bodine Environmental Services, Inc., an Illinois EPA approved contractor. However, the leaking drums remain at the Facility. In this court's view, unless the Illinois EPA has an extremely good justification for refusing to accept Grigoleit's proposals for removing drums from the Facility, the Illinois EPA has to be considered extremely culpable for any environmental hazards still existing at the Facility. If no adequate justification exists, this court must agree with Grigoleit's expert witness that "[t]o the extent that the drums remaining ... pose a threat to human health or the environment, the State bears the majority of the responsibility."

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A disputed fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Neither the mere existence of some factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. *Debs v. Northeastern Ill. Univ.,* 153 F.3d 390, 394 (7th Cir.1998).

### B. THE STATE'S MOTION

The State argues that it is entitled to judgment against Grigoleit and the Herald & Review as to liability under CERCLA and the Illinois Act.

The two main purposes of CERCLA are: (1) prompt cleanup of hazardous waste sites; and (2) imposition of all cleanup costs on the responsible party. *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Section 107, one of CERCLA's key provisions, permits both government and private party plaintiffs to recover the costs incurred in responding to and cleaning up hazardous substances at contaminated sites. *American Nat'l Bank & Trust Co. v. Harcros Chem., Inc.,* 997 F.Supp. 994, 998 (N.D.Ill.1998). Section 107(a) provides a "cost recovery" action for governmental entities and private parties who clean up contaminated sites. 42 U.S.C. § 9607(a); *Estes v. Scotsman Group, Inc.,* 16 F.Supp.2d 983, 987 (C.D.Ill.1998).

Liability is established under CERCLA § 107(a) if: (1) the site in question is a "facility" as defined in § 101(9);

(2) the defendant is a responsible person under § 107(a); (3) a release or threatened release of a hazardous substance has occurred; and (4) the release or threatened release has caused the plaintiff to incur response costs. *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir.1994); *Harcros Chem., Inc.*, 997 F.Supp. at 998. The State argues that the evidence shows that each of these elements has been shown as to Grigoleit and the Herald & Review.

### 1. STATUTE OF LIMITATIONS

Grigoleit argues that the State is not entitled to summary judgment on liability because its CERCLA action was not timely filed.

A statute of limitations was added to CERCLA in 1986. The statute provides, in pertinent part:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—
>
> (A) for a removal action, within 3 years after completion of the removal action, ... and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action. 42 U.S.C. 9613(g)(2).

The Seventh Circuit recently noted that, by implementing the statute of limitations, Congress "expressed a determination that, in order to achieve timely clean-up of affected sites and to ensure replenishment of the fund, cost recovery actions must commence in a timely fashion." *United States v. Navistar Int'l Transp. Corp.*, 152 F.3d 702, 706 (7th Cir.1998). Grigoleit argues that the State's CERCLA action is not timely whether the action is considered a removal action or a remedial action. This court notes that it is hard to imagine that the State's action, filed more than 9 years after the Illinois EPA's inspection of the Facility and more than 14 years after the Illinois EPA first learned there were drums at the Facility, was timely filed under CERCLA's statute of limitations. However, based upon the applicable case

law, this court must conclude that the State's Complaint was timely filed whether it is considered a removal action or a remedial action.

#### a. REMOVAL ACTION

■ Grigoleit argues that, if the activity at the site has been removal work, this removal work has been limited to the onsite work performed by Riedel. Grigoleit further argues, because this work was complete in 1993, the State's action was filed after the applicable three year statute of limitations had run.

The State responds that, because hazardous substances remain at the Facility, the removal action has not been completed and the limitations period has not run. This court reluctantly agrees. A number of district court decisions have held that a "removal" action is not complete until a document has been issued which contains the final remedy selected for the site. *See United States v. Petersen Sand & Gravel, Inc.*, 824 F.Supp. 751, 755 (N.D.Ill.1991); *United States v. R.A. Corbett Transport, Inc.*, 785 F.Supp. 81, 82 (E.D.Tex.1990). Courts have also held that "removal actions" include the final site inspection after the cleanup is completed. *See United States v. Cantrell*, 92 F.Supp.2d 704, 716 (S.D.Ohio 2000); *United States v. City of Aberdeen, Miss.*, 929 F.Supp. 989, 993 (N.D.Miss.1996). A district court in Illinois recently concluded that a "removal action" was not completed so long as the plaintiff continued to evaluate, assess and monitor the land where the hazardous materials were disposed of. *Nutrasweet Co. v. X–L Eng'g Corp.*, 926 F.Supp. 767, 770–71 (N.D.Ill.1996) (*citing Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir.1994)); *see also United States v. Rohm & Haas Co.*, 790 F.Supp. 1255, 1264–65 (E.D.Pa.1992), *rev'd on other grounds*, 2 F.3d 1265 (3d Cir.1993). In this case, it is clear that the Facility has not been cleaned up and, based upon the case law, the removal action is not completed. Accordingly, the statute of limita-

tions had not run when the Complaint was filed in 1998.

### b. REMEDIAL ACTION

■ Grigoleit also notes that both Seul and Doubet testified that the Illinois EPA's activity at the site has been remedial in nature. Grigoleit further argues that the Illinois EPA initiated substantial on-site activity in 1989. Grigoleit therefore contends that the six year statute of limitations began running in 1989 and the 1998 Complaint was not timely.

The State has not responded to this argument. However, this court notes that while the Illinois EPA inspected the property in August 1989, the statute provides that time begins running for a remedial action when there is (1) physical (2) initiation (3) on the site (4) of the construction (5) of the remedial action. *Navistar*, 152 F.3d at 711; *see also State of Cal. v. Hyampom Lumber Co.*, 903 F.Supp. 1389, 1391 (E.D.Cal.1995). In *Navistar*, the Seventh Circuit held that the statute of limitations was triggered when a "lift" of clay to build a permanent clay cap was placed on a landfill. The court noted that the placement of the clay was a physical action taken at the site and was the "initiation" of "construction" consistent with the permanent remedy. *Navistar*, 152 F.3d at 713. Similarly, the court in *Hyampom Lumber Co.* concluded that the installation of fences and utilities in preparation for the excavation and removal of contaminated soil from the site was "construction" which started the 6–year statute of limitations for remedial actions to run. *Hyampom Lumber Co.*, 903 F.Supp. at 1392–94. This court concludes that the inspection and sampling undertaken by the Illinois EPA in 1989 cannot be considered physical initiation of construction of the remedial action. *See State of La. v. Braselman Corp.*, 78 F.Supp.2d 543, 548–49 (E.D.La. 1999) (use of monitoring wells did not trigger initiation of remedial action and running of limitations period); *Hyampom*, 903 F.Supp. at 1392 (preliminary and tentative "physical on-site" activities are not part of the "construction" of the remedial action).

It is possible that the overpacking of the drums in 1993 could be considered "construction" sufficient to start the statute of limitations running. However, the Complaint in this case was filed less than six years after the overpacking was completed. Accordingly, if the action in this case is properly characterized as remedial, the action is timely.

### 2. ELEMENTS OF CERCLA LIABILITY

Because this court has concluded that the State's action was timely, it must consider whether the State has established all of the elements necessary for CERCLA liability and is entitled to summary judgment against Grigoleit and the Herald & Review.

### a. FACILITY

The first element is that the site in question is a "facility" as defined in § 101(9). Under CERCLA, the term "facility" means "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9)(B). Neither Grigoleit nor the Herald & Review dispute that the Midland Machine property is a "facility" under CERCLA.

### b. RESPONSIBLE PERSON

■ The second element is that the defendant must be a responsible person under § 107(a). Section 107(a) provides that "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person" shall be liable for "all costs of removal or remedial action incurred by . . . a State." 42 U.S.C. § 9607(a)(3), (4). Grigoleit argues that, because it only arranged for used hydraulic oil to be picked up by Ray and William, it did not "arrange" for the "disposal" of "hazardous substances." This court finds

this argument unpersuasive. William testified that he and Ray picked up all the drums Grigoleit had at the time and that the barrels contained "old, smelly solvents," not hydraulic oil. William testified that none of the material in the drums was useable. White could not contradict William's testimony as he did not really know what Ray and William picked up and conceded that solvents could have been mixed in with hydraulic oil. White also testified that drums of solvents were stored at Grigoleit at the time. This court concludes that the evidence in this case is clearly sufficient to establish that Grigoleit "arranged" for the "disposal" of "hazardous substances."

Grigoleit also argues that the State has not shown that Grigoleit provided any hazardous materials to the site. Grigoleit argues that the State has not cited any admissible evidence that a drum allegedly received from Grigoleit contained a hazardous substance. Similarly, the Herald & Review argues that the State has not shown that any drums sent to the Facility by the Herald & Review contained hazardous substances. The Herald & Review argues that none of the drums which were tested and found to contain hazardous substances were shown to be drums from the Herald & Review. The Herald & Review also notes that the 83 drums which were sampled in 1995 and removed in 1996 were found not ignitable. The Herald & Review further notes that, although barium, cadmium, chromium and lead were found in some of the 83 drums, "none of these elements were found in concentrations greater than the regulatory levels required by regulation." In addition, the Herald & Review notes that the 83 drums were found to be special wastes rather than hazardous wastes.

■ In response, the State argues that there are no quantitative levels of hazardous substances required to trigger liability under CERCLA. This court must agree that numerous decisions hold that the amount of concentration of a hazardous substance is irrelevant for CERCLA liability purposes. *Continental Title Co. v. Peoples Gas Light & Coke Co.*, 1999 WL 1250666, at *11 (N.D.Ill.1999), *adopted by* 1999 WL 753933 (N.D.Ill.1999) (*citing B.F. Goodrich v. Betkoski*, 99 F.3d 505, 515 (2d Cir.1996), *rehearing denied*, 112 F.3d 88 (2d Cir.1997), *cert. denied by Zollo Drum Co. v. B.F. Goodrich Co.*, 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *Cose v. Getty Oil Co.*, 4 F.3d 700, 708–09 (9th Cir.1993); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259–61 (3d Cir. 1992); *City of New York v. Exxon Corp.*, 744 F.Supp. 474, 483–84 (S.D.N.Y.1990); *United States v. Western Processing Co.*, 734 F.Supp. 930, 936 (W.D.Wash.1990)); *see also Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 76 (1st Cir.1999); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989). CERCLA, on its face, applies to "any" hazardous substance, and it does not impose quantitative requirements. *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir.1993). "The absence of such quantity requirements in CERCLA leads inevitably to the conclusion that Congress planned for the 'hazardous substance' definition to include even minimal amounts of pollution." *Alcan Aluminum Corp.*, 990 F.2d at 720; *see also Cantrell*, 92 F.Supp.2d at 713 (the amount of hazardous substances an arranger disposed of is not relevant for purposes of establishing liability). Accordingly, this court must agree with the State that, because the Herald & Review has acknowledged that its drums did contain components listed as hazardous substances under the Clean Air Act, its wastes must be considered hazardous substances under CERCLA. *See* 42 U.S.C. § 9601(14) ("[t]he term 'hazardous substance' means ... *any* hazardous air pollutant listed under section 112 of the Clean Air Act" (emphasis added)). In addition, the evidence shows that toluene and xylene were present in samples taken from the drums. These are solvents used by Grigoleit in its manufacturing process. This court concludes that the evidence is sufficient to show that drums on the site which came

from Grigoleit contain hazardous substances under CERCLA. This court therefore concludes that the evidence shows that Grigoleit and the Herald & Review are responsible persons under CERCLA.

### c. RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCE

The third element is that a release or threatened release of a hazardous substance has occurred. The term "release" is defined to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

The Herald & Review argues that the State failed to show that a release of hazardous substances has occurred. The Herald & Review notes that it conducted soil samples after its drums were removed which indicated that there were no hazardous substances detectable. The Herald & Review further notes that it removed all of the drums determined to be attributable to it in November 1996 so there is no continued threat of release of hazardous substances.

Grigoleit argues there is only one drum which the State has shown contains a hazardous substance and which was found in the area where drums from Grigoleit were located at the Facility. Grigoleit argues that the evidence shows that this particular drum has not been observed to be leaking and, in fact, was observed to be in good and sealed condition. Accordingly, Grigoleit argues that the State "lacks the evidence to connect a release or threatened release from a drum allegedly received from Grigoleit *and* allegedly containing a hazardous substance."

■ This court concludes that the Herald & Review and Grigoleit are trying to place strict, technical proof requirements into CERCLA which do not exist. The State is correct that there is no requirement under CERCLA that it must prove that a specific defendant's waste caused the State to incur response costs. CERCLA's § 107(a) imposes strict liability without regard to causation on parties who fall within at least one of the four categories of potentially responsible persons. *Bedford Affiliates v. Sills*, 156 F.3d 416, 425 (2d Cir.1998); *see also Cantrell*, 92 F.Supp.2d at 713 (liability under CERCLA is strict and the government only needs to establish the prima facie elements to prove the defendant liable). Accordingly, under CERCLA, once a plaintiff establishes that a defendant is a responsible person and that it has incurred cleanup costs based upon a release or threatened release, it does not need to show that a specific defendant's waste caused incurrence of the cleanup costs. *Bedford Affiliates*, 156 F.3d at 425; *Alcan Aluminum Corp.*, 990 F.2d at 721; *United States v. Alcan Aluminum Corp.*, 97 F.Supp.2d 248, 272 (N.D.N.Y.2000). In this case, this court has already concluded that both Grigoleit and the Herald & Review are responsible persons because they disposed of drums containing hazardous substances at the Facility. This court further concludes from its review of the record that these drums were abandoned or discarded at the Facility and that drums containing hazardous substances have leaked. This evidence is clearly sufficient to show a "release" under CERCLA. Accordingly, Grigoleit and the Herald & Review are strictly liable unless they can establish one of the affirmative defenses provided in CERCLA.

In an action brought under § 107, an otherwise liable party may avoid liability only if it can establish by a preponderance that the release or threatened release of the hazardous substance or substances and the resulting damages were caused *solely* by one or more of the following: an act of God, an act of war, or, subject to certain limitations, an act or omission of a third party. 42 U.S.C. § 9607(b); *Cantrell*, 92 F.Supp.2d at 710; *United States v. Findett*

*Corp.,* 75 F.Supp.2d 982, 986 (E.D.Mo. 1999). If defendants fail to establish one of the affirmative defenses listed in CERCLA, they must be held strictly liable for the response costs. *Cantrell,* 92 F.Supp.2d at 710. In this case, neither Grigoleit nor the Herald & Review has shown that its actions played no part in any release of hazardous substances at the Facility. *See Findett Corp.,* 75 F.Supp.2d at 989. Therefore, they cannot establish that the release of hazardous substances was caused solely by the act or omission of a third party. *See* 42 U.S.C. § 9607(b)(3). Accordingly, neither Grigoleit nor the Herald & Review has raised a genuine issue of material fact with regard to the three affirmative defenses available under 42 U.S.C. § 9607(b). *See Findett Corp.,* 75 F.Supp.2d at 989.

Grigoleit also argues that the imposition of joint and several liability is not appropriate where there exists a reasonable basis for division of liability among defendants. However, liability may be decided first before the more complicated questions implicated in cleanup actions, including fixing the proportionate fault of liable parties. *Alcan Aluminum Corp.,* 990 F.2d at 720; *see also Acushnet Co.,* 191 F.3d at 82 ("[d]istrict courts have considerable latitude to deal with issues of liability and apportionment in the order they see fit to bring the proceedings to a just and speedy conclusion"). If a plaintiff establishes each of the four elements and the defendant is unable to establish one of the defenses listed in § 107(b), the plaintiff is entitled to summary judgment on the liability issue. *Environmental Transp. Sys., Inc. v. ENSCO, Inc.,* 969 F.2d 503 507 (7th Cir.1992). Responsible parties can defeat the imposition of joint and several liability only by affirmatively demonstrating that the harm is divisible. *Cantrell,* 92 F.Supp.2d at 711; *see also ENSCO, Inc.,* 969 F.2d at 508 (listing six factors which could be evaluated in order to determine whether joint and several liability should be imposed, including "the ability of the parties to demonstrate that their contribution to a discharge, release

or disposal of a hazardous waste can be distinguished"). However, given the nature of hazardous waste disposal, it is rare for a responsible party to be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm. *Cantrell,* 92 F.Supp.2d at 711 (*quoting Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 348 (6th Cir. 1998)). In this case, Grigoleit has not put forward any affirmative evidence that the harm at the Facility is divisible. *See Cantrell,* 92 F.Supp.2d at 718. Accordingly, this court holds that Grigoleit is jointly and severally liable for response costs incurred at the Facility. *See Cantrell,* 92 F.Supp.2d at 718.

At trial, evidence may be presented regarding the allocation of response costs among the liable parties. Section 113(f)(1) of CERCLA directs courts to allocate costs of cleanup between responsible parties "using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1); *ENSCO, Inc.,* 969 F.2d at 507; *see also Browning–Ferris Indus. of Ill., Inc. v. Ter Maat,* 195 F.3d 953, 955 (7th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). "[P]olluters differ in the blameworthiness of the decisions or omissions that led to the pollution, and blameworthiness is relevant to an equitable allocation of joint costs." *Browning–Ferris,* 195 F.3d at 958–59. The concentration of the hazardous substances, although irrelevant at the liability stage, may become relevant in allocating the amounts recoverable from Defendants. *See Continental Title Co.,* 1999 WL 1250666, at *11.

### d. RESPONSE COSTS

The fourth element is that the release or threatened release has caused the plaintiff to incur response costs. The Herald & Review argues that the response costs incurred by the State could have been substantially reduced if the State had been more cooperative from the beginning. The Herald & Review therefore contends

that the State's alleged response costs were excessive and that most of the response costs incurred by the State were not a result of the Herald & Review's actions. Grigoleit argues that the State is not entitled to summary judgment on the issue of liability because the State's response costs were not consistent with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) (published at 40 C.F.R. pt. 300). The NCP is a set of criteria describing the procedures and standards for responding to hazardous waste releases. *Estes,* '16 F.Supp.2d at 990. It is designed to promote cost-effective measures to protect public health and the environment. *Union Pac. R.R. Co. v. Reilly Indus., Inc.,* 215 F.3d 830, 834 (8th Cir.2000). Grigoleit is correct that, under CERCLA, the State can only recover costs incurred which are not inconsistent with the NCP. *See* 42 U.S.C. § 9607(a)(4)(A). However, the State argues that consistency with the NCP is not an element of liability under CERCLA. This court agrees.

▮ Where the party seeking its response costs is the United States Government, a State or an Indian tribe, it may recover all of those costs, regardless of necessity, that are "not inconsistent with the national contingency plan." *Findett Corp.,* 75 F.Supp.2d at 986 n. 2 (*citing* 42 U.S.C. § 9607(a)(4)(A)). Moreover, in an action brought by one of those three parties, the burden of proof as to inconsistency is on the defendant. *Findett,* 75 F.Supp.2d at 990; *see also State of Minnesota v. Kalman W. Abrams Metals, Inc.,* 155 F.3d 1019, 1024 (8th Cir.1998). This "defense" is not relevant to the issue of liability for response costs. *Cantrell,* 92 F.Supp.2d at 717. This issue will not be relevant until the proceedings enter the damages phase. *See Cantrell,* 92 F.Supp.2d at 717. At that stage, the issue of inconsistency with the NCP will be judicially reviewed under the arbitrary and capricious standard of review for agency action. *See Kalman W. Abrams Metals, Inc.,* 155 F.3d at 1024; *Alcan Aluminum Corp.,* 97 F.Supp.2d at 271. This court

notes that the NCP prescribes more detailed procedures and standards for remedial actions than removal actions. *See Kalman W. Abrams Metals, Inc.,* 155 F.3d at 1024 (*comparing* 40 C.F.R. §§ 300.410, 300.415 (removal actions) *with* 40 C.F.R. §§ 300.420–300.435 (remedial actions)). In this case, Defendants may be able to show that it would be more appropriate to hold the State to the NCP standards for remedial action. *See Kalman W. Abrams Metals, Inc.,* 155 F.3d at 1024 (the permanent nature of the site cleanup and the leisurely manner in which the agency dealt with the problem made it appropriate to hold the agency to the NCP standards for remedial action).

### 3. CONCLUSION

This court has concluded that the State has provided evidence establishing all four elements required to show that Grigoleit and the Herald & Review are liable under CERCLA. Based upon the applicable case law, neither Grigoleit nor the Herald & Review has shown any genuine issue of material fact regarding the existence of any of the necessary elements. Accordingly, the State's Motion for Partial Summary Judgment as to liability under CERCLA is GRANTED.

### 4. ILLINOIS ACT

The parties have agreed that the liability of Grigoleit and the Herald & Review under the Illinois Act is dependent on their liability under CERCLA. Accordingly, because the State is entitled to summary judgment as to liability under CERCLA, the State is entitled to summary judgment as to liability under the Illinois Act.

### C. THE PUNCHES' MOTION

▮ On January 15, 1999, Grigoleit filed its Third–Party Complaint (# 7) against the Punches. Grigoleit claimed that the Punches were liable for cleanup costs at the Facility under CERCLA and under a trust fund theory. The Punches

argue that they are entitled to summary judgment on Grigoleit's third-party claim against them. They argue that their only possible connection with this case is the fact that Patricia technically held an equitable interest in the Facility as an heir of Ray's estate from the date of Ray's death until the property was transferred to William by warranty deed on December 27, 1985. They further argue that Dennis has never even held *any* legal or equitable interest in the property. Dennis testified at his deposition that he signed the warranty deed because instructed to do so by the attorney for Ray's estate. Both of the Punches testified that they did not participate in any way with the operation of the business at the Facility and did not know about the barrels or drums at the Facility. The Punches note that the evidence shows that any hazardous substances at the Facility were taken there prior to Ray's death. They therefore contend that they were not prior owners of the facility at the time of the disposal of hazardous substances and have no liability under CERCLA in this case.

In response, Grigoleit argues that the Punches are not entitled to summary judgment on Counts I, II and III of its Third–Party Complaint, brought pursuant to CERCLA. Grigoleit argues that, during the time Patricia held an equitable interest in the property, William continued operations at the site and the Illinois EPA notified William that he was in violation of the Illinois Act. Grigoleit also notes that the Punches testified that they visited the site during this period of time. Grigoleit cites no statute or case law which supports its argument that the Punches could be liable under CERCLA based upon these facts.

Under § 107(a) of CERCLA, a "responsible person" includes the current owner or operator of the facility, any person who owned or operated the facility at the time of the disposal, any person who arranged for the disposal of hazardous substances at the facility and any person who accepted the same for transport to treatment facilities. *Norfolk S. Ry. Co. v. Shulimson Bros. Co.*, 1 F.Supp.2d 553, 556 (W.D.N.C.

1998). The evidence before this court shows that the drums containing hazardous substances were at the Facility before Ray's death and before the short period of time when Patricia held an ownership interest in the Facility. Accordingly, this court agrees with the Punches that neither Patricia nor Dennis is liable under § 107(a)(2) of CERCLA as a "person *who at the time of disposal of any hazardous substance* owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2) (emphasis added). This court further notes that no other subsection of § 107(a) would apply to impose liability on the Punches under the facts here. Because the Punches are not liable under § 107(a) of CERCLA, Grigoleit cannot seek contribution from them under § 113(f) of CERCLA. 42 U.S.C. § 9613(f) (a "person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title").

■ Grigoleit further argues that summary judgment should not be granted to the Punches as to Count IV of its Third–Party Complaint, brought under a trust fund theory. Grigoleit relies on *State of N.C. ex rel. Howes v. W.R. Peele Sr. Trust*, 876 F.Supp. 733 (E.D.N.C.1995). In that case, the court noted that, under a trust fund theory, "a beneficiary is deemed to hold the assets received from a liable party's estate in trust for the benefit of satisfying environmental liabilities of a deceased, responsible person." *Howes*, 876 F.Supp. at 743. The court noted that "this theory furthers CERCLA's remedial purpose so as to ensure a responsible party bears the costs of remedying the harm associated with the disposal of hazardous waste." *Howes*, 876 F.Supp. at 743. Based upon *Howes*, Grigoleit essentially argues that the Punches hold the Deco property, which they still own and from which they regularly receive lease payments, in trust for satisfying Ray's environmental liabilities.

This court concludes that the Punches cannot be liable based upon a CERCLA trust fund theory under the facts here. Ray died in 1984 and it appears from the record that his estate was fully distributed and closed in 1985. The court in *Norfolk S. Ry. Co.* declined to find distributees of two estates accountable under a trust fund theory. The court concluded that "fully distributed and closed estates whose beneficiaries have not been involved in the activities which gave rise to the CERCLA liability by any method other than inheritance are not subject to liability under the statute." *Norfolk S. Ry. Co.*, 1 F.Supp.2d at 558 (*citing Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1285, 1292 (E.D.Va.1993) ("the explicit provision in CERCLA creating an 'innocent landowner defense' for parties who merely acquire contaminated property by inheritance demonstrates Congress' intent that a person should not be subjected to CERCLA liability merely because property has been inherited")). The Third Circuit has noted that "[t]he possibility of a CERCLA claim arising long after the settlement of the estate would hang as a dark cloud over any such settlement, thereby compromising the goals of certainty and promptness in the settlement and distribution of decedent's estates." *Witco Corp. v. Beekhuis*, 38 F.3d 682, 690 (3d Cir.1994) (*quoting Witco Corp. v. Beekhuis*, 822 F.Supp. 1084, 1090 (D.Del.1993)). This court therefore concludes that, because Ray's estate was distributed and closed long ago, any assets received by the Punches are not subject to the imposition of a trust for the purpose of satisfying Ray's environmental liabilities under CERCLA.

For all of the reasons stated, the Punches' Motion for Summary Judgment (# 60) is GRANTED.

### III.  MOTION TO STRIKE

On January 20, 2000, Grigoleit filed a Motion to Strike William's Cross-claims against Grigoleit (# 63). William's Cross-claim (# 59) was filed on December 27, 1999. Grigoleit argued that William's Cross-claim (# 59) should be stricken because he did not seek leave to file the Cross-claim. Grigoleit further noted that any motion for leave to file the Cross-claim would be untimely because the deadline for amendment of pleadings was established as January 3, 2000. On January 27, 2000, William filed a Motion for Leave to Enlarge Time to File a Motion for Leave to File a Cross-claim against Grigoleit (# 65). On May 30, 2000, William's Motion (# 65) was granted by this court in a docket entry. However, William has not filed a Motion for Leave to File a Cross-claim against Grigoleit. Accordingly, Grigoleit's Motion to Strike (# 63) is GRANTED.

### IV.  SUPPLEMENTAL MOTION TO COMPEL

On March 23, 2000, Grigoleit filed a Supplemental Motion for Order to Compel Sandra Forsyth–Black and EASE to Produce Records and Appear at Deposition (# 76). On May 23, 2000, a hearing was held on this Motion before Magistrate Judge David G. Bernthal. At the hearing, counsel for Grigoleit acknowledged receipt of a box of documents and aerial photos. Counsel requested a certification from Ms. Forsyth–Black that the information received represented a full production of the requested documents. Counsel for the Herald & Review agreed to provide the certification. Counsel for Grigoleit was to advise the court if he did not receive the certification. Counsel has not filed anything with this court to indicate that the certification was not received. Accordingly, this court now finds that the requested documents and certification were provided and the Motion to Compel (# 76) is DENIED as moot.

### V.  MOTIONS PURSUANT TO RULE 37

On June 2, 2000, Grigoleit filed a Motion Pursuant to Rule 37 of the Federal Rules of Civil Procedure Directed to Plaintiff and Plaintiff's Failure to Disclose Relevant Financial Documentation and Information (# 97) and a Memorandum in Support of

the Motion (# 98). On June 9, 2000, the Herald & Review filed a Motion (# 99) adopting and incorporating Grigoleit's Motion. On June 23, 2000, the State filed a Memorandum of Law in Response (# 106), a Second Supplemental Privilege Log (# 108) and a packet of in camera exhibits (# 107) filed under seal.

The documents filed by the parties show that Janet Zanetello, an account supervisor for the Illinois EPA, was deposed on April 20, 2000. During her deposition, Zanetello stated that she modified some financial records related to the costs allegedly incurred by the State in this case. These modified records were disclosed to Defendants. However, the notations explaining the handwritten modifications of the figures on the financial records were blacked out with magic marker. Zanetello refused to answer questions regarding the notations at the advice of the State's counsel and the staff attorney for the Illinois EPA involved in this case. The attorneys claimed that the information was privileged as work product. Mary Remmers, manager of the Financial Management Unit at the Illinois EPA, was deposed on February 2, 2000. Similarly, at her deposition, Remmers refused to disclose why certain dollar figures on the invoice vouchers were lined out and why other dollar figures were written in. Remmers' refusal was at the direction of the State's counsel who claimed the information was privileged as work product.

In their Motions, Grigoleit and the Herald & Review are seeking an order compelling the State to produce unaltered copies of all financial documents and files, an order compelling Remmers and Zanetello to reappear at deposition and answer all questions related to the alteration of documents, and various sanctions against the State.

This court notes that the actions of the State's counsel and the staff attorney for the Illinois EPA in instructing Remmers and Zanetello to modify documents, which they then disclosed to Defendants with only some of the modifications blacked out, seem to this court designed to do nothing other than intensify the ongoing contentiousness between the parties. The instructions of the attorneys, in this court's view, were not designed to produce evidence which is in any way relevant to any issue in this case. This court further notes that any privilege clearly may have been waived by the State's actions in disclosing the modified documents. This court does agree with the State that it is unclear whether Grigoleit and the Herald & Review are requesting production of the financial documents as they existed before any modifications were made or the financial documents with the modifications before some of the modifications were blacked out. This court notes that the financial documents, without any alterations, are clearly relevant to the State's claims for response costs. These documents must be provided by the State to Grigoleit and the Herald & Review.

This court takes Grigoleit's Motion Pursuant to Rule 37(# 97) and the Herald & Review's Motion adopting Grigoleit's Motion (# 99) under advisement. The issue of sanctions against the State and its attorneys will be taken up at trial.

IT IS THEREFORE ORDERED THAT:

(1) The Punches' Motion for Summary Judgment (# 60) is GRANTED.

(2) The State's Motion for Partial Summary Judgment (# 72) is GRANTED. Judgment is entered in favor of the State and against Grigoleit and the Herald & Review solely on the issue of liability under CERCLA and the Illinois Act.

(3) Grigoleit's Motion to Strike (# 63) is GRANTED.

(4) Grigoleit's Supplemental Motion to Compel (# 76) is DENIED as moot.

(4) Grigoleit's Motion Pursuant to Rule 37(# 97) adopted by the Herald & Review (# 99) is taken under advisement. The issue of sanctions against the State and its attorneys will be taken up at trial.

This case remains set for a final pretrial conference on July 19, 2000, at 11:00 a.m. and is set for bench trial at 9:30 a.m. on August 7, 2000.